**NATIONAL AIR CARRIER ASSOCIA-
TION et al., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Trans World Airlines, Inc., Pan American
World Airways (Pan American),
Intervenors.

No. 23988.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 22, 1971.

Decided March 9, 1971.

Mr. Robert M. Lichtman, Washington, D. C., with whom Mr. Jerry D. Anker, Washington, D. C., was on the brief, for petitioners.

Mr. Warren L. Sharfman, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, with whom Messrs. O. D. Ozment, Deputy General Counsel, Robert L. Toomey and J. Michael Roach, Attys., Civil Aeronautics Board, and Mr. Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondent. Mr. R. Tenney Johnson, General Counsel, Civil Aeronautics Board, also entered an appearance for respondent.

Mr. Ulrich V. Hoffmann, Washington, D. C., entered an appearance for intervenor Trans World Airlines, Inc.

Mr. Robert N. Duggan, Washington, D. C., entered an appearance for intervenor Pan American World Airways, Inc.

ʻ Before McGOWAN, TAMM and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

On this petition for review of two orders issued by the Civil Aeronautics Board, we resume our consideration of issues foreshadowed in National Air Carrier Association, et al. v. CAB, 141 U.S. App.D.C. 31, 436 F.2d 185, which we decided on May 28, 1970, less than a year ago. We referred there to the significantly more limited role which Congress has assigned the Board in supervising international air transportation rates as distinguished from domestic. We also described the consensual mechanism from which the former emerge, involving the fixing of rates by carrier agreement under the shield of antitrust immunity contingent upon the Board's approval of such agreements as "not * * * adverse to the public interest, or in violation of" the Federal Aviation Act of 1958. 49 U.S.C. §§ 412, 422. We identified with particularity the various North Atlantic passenger fare provisions agreed upon at the International Air Transport Association traffic conferences, first at Dallas and subsequently at Caracas, to be effective for a two-year period ending March 31, 1971—a date only some 60 days after the instant appeal was heard by this court.

In the face of that deadline, we do not propose to go over again the same ground we traversed in our *1970 NACA* case.[1] That decision has contributed its portion to the ground rules for what we there referred to as "the continuing battle between the scheduled airlines which are members of IATA and the supplemental carriers." Those doctrinal formulations of immediate relevance to the appeal

[1]. Under review there was a Board order of April 30, 1969, in which the Board (1) gave temporary approval to certain of the Dallas fare provisions pending a full evidentiary investigation, and (2) approved, without evidentiary inquiry, certain group

presently before us may fairly be stated as follows:

1. Section 412, in its omission of any stated requirement for a full evidentiary hearing as a condition precedent to the approval of a conference rate agreement, leaves room for the Board in its discretion to proceed by way of something less in appropriate circumstances.

2. There is no single criterion, such as, for example, the failure of a rate to recover fully distributed costs, by which to measure conformity to antitrust principles. Rather, "the essential question, from an antitrust standpoint, is whether the existence of a market structure conducive to maximum feasible competition will be imperiled by approval of the agreement."

With the aid of these steps in the development of standards for judicial review of the Board's work in this area, we have addressed ourselves to the issues raised on this appeal. We have considered with care all of the many contentions raised by NACA, and we remain unpersuaded that any of them necessitates disturbance of the Board's dispositions. We deal hereafter with the major points which have been pressed upon us.

## I

An overriding claim made by petitioners is that they were denied procedural fair play, both in the Board's failure to afford an evidentiary hearing with respect to some of the fares in question, and in the scope of inquiry sought by them as to the fares which were set down for evidentiary inquiry before an examiner. A prefatory observation in this regard may be useful. It is by no means unnatural that business entities which function outside an antitrust umbrella may have a pervading sense of the injustice of competing with those who are within its shelter. In this country, unlike most if not all of the other nations participating in international rate making, the antitrust ethic is strongly operative. The supplemental carriers of American origin are, therefore, inclined to be apprehensive of what goes on in the protected circle of which they are not a part, and to feel greatly disadvantaged by comparison with the U.S. scheduled carriers (Pan American and TWA) who participate in the North Atlantic rate conference. Any rate made for competitive advantage by such conferences is likely to be viewed by the supplementals as infected by an unholy predatory purpose.

As far back as 1946, however, the Board, as it was statutorily empowered to do, relaxed the rigors of the antitrust laws for international commercial aviation. IATA Traffic Conference Resolutions, 6 C.A.B. 639 (1946). It was, indeed, because of the inherent dangers in the situation so created that the Board moved, under Congressional authorization (49 U.S.C. § 1387), to create a competitive force in the person of the supplemental carriers. These irregular carriers eagerly sought the privilege of engaging in this competition upon its own terms, and applied for and received from the Board certificates according them the right to engage in transatlantic charter services. Thus, they may not logically insist that every competitive effort made by the scheduled carriers is somehow wrong because it is a concerted attempt by these carriers to increase their share of the business at the expense of the supplementals.

This is not to say that the Board should be oblivious of the concerns of the supplementals, nor ever less than acutely alert to search out and to disapprove concerted action which, by unfair and indefensible means, seriously threatens the role they have been given to play. As was said in the latest Statement of International Air Transportation Policy of the United States, approved by the President on June 22 last:

"Both scheduled carriers and supplemental carriers should be permitted a

---

fares. The two orders now before us were issued by the Board on February 26, 1970. Their effect was to approve all of the fare agreements initiated at Dallas and continued, with only a few changes, at Caracas.

fair opportunity to compete in the bulk transportation market. We consider passengers traveling at group rates on scheduled services to be part of that market. Regulatory and promotional policies should give greater recognition to the dimensions, characteristics and needs of the bulk transportation market, as such, and less emphasis to the type of carrier that is serving that market. However, the Government should not allow enjoyment of the right to perform both scheduled service and charter service to result in decisive competitive advantages for scheduled carriers."

█ In the implementation of this policy of striking a fair balance between the competitive opportunities of the scheduled carriers, on thé one hand, and the supplementals, on the other, adequate procedures for inquiry into the facts are plainly important. The purposes of that inquiry are not, however, exhausted by the mere ascertainment of a conference intent to aggrandize the share of the scheduled carriers in a market also served by the supplementals. Congress, the Board, and the Executive alike have

assumed the propriety of such an intent. The question, as we have said, remains one of whether the particular means devised for its effectuation unduly jeopardize "a market structure conducive to maximum feasible competition." Congress has not conceived that the full evidentiary hearing is invariably essential to the resolution of that question, although there may be circumstances in which it becomes so. The procedural issue before us is whether there were such circumstances in this case.

In *1970 NACA*, we noted that the Board had made an affirmative determination in this regard with respect to three of the proposals emanating from the Dallas Conference. There were (1) the elimination of the 5% round trip discount for individually-ticketed passengers, (2) the Contract Bulk Inclusive Tour Fares (CBIT's), and (3) the reductions in the California Proportional Fares.[2] The Board gave a temporary approval to the conference agreements respecting these matters pending an expedited evidentiary inquiry. That temporary approval was challenged by petitioners unavailingly in *1970 NACA*, but, while that appeal was under submission

---

2. These were part of the six-item package of fares agreed upon at Dallas, which we summarized in *1970 NACA* as follows:

  (1) Fare increases for individually-ticketed passengers were effected through elimination of the five percent discount for passengers purchasing round-trip tickets.

  (2) Contract Bulk Inclusive Tour Fares (CBIT's)—This set of fares provides for the sale of blocks of seats to tour operators, who will then retail them to the public as part of inclusive tours composed of ground accommodations as well as air transportation.

  (3) Affinity Group Fares—These fares are available only to groups which are comprised of members of an organization existing primarily for purposes other than travel, and which satisfy other prescribed limitations. Fare levels vary with the size of the group, the season of the year, and the direction of travel.

  (4) Incentive Group Fares—Like the CBIT's, the Incentive Group Fares are

a promotional innovation. They are available to groups of a specified size which are composed of employees, dealers, or agents of a profit-making organization, and which are traveling under an established "incentive travel program" rewarding past work or encouraging future activity.

  (5) Group Inclusive Tour Fares (GIT's)—These fares are available to groups of fifteen or more purchasing package tours from a tour operator; the tours must include a specified minimum expenditure for ground accommodations.

  (6) California Proportional Fares—The IATA resolution also reduced the "proportional fares," or amounts added on to the basic transatlantic fare, for passengers originating their flights in California rather than New York; proportional fares from other points outside of New York were not significantly changed.

in this court, the Dallas agreement expired prematurely on October 19, 1969, because the Italian carrier, Alitalia, withdrew, thereby precipitating an "open rate" situation in which the IATA carriers were individually free to charge any rates they chose.

A new IATA conference was convened in Caracas, which resulted in the filing in December, 1969, of a new agreement which continued the Dallas proposals largely in the same form. Among those unchanged were the ones which had been made the subject of an evidentiary hearing. That hearing had, in the interim, gone forward, and the examiner made his recommended decision on December 11, 1969—prior to the filing of the Caracas agreement.

On January 16, 1970, the Board provided for the filing of documentary submissions on the Caracas agreement within ten days. In the submission made by NACA, in addition to making various objections to the fare proposals, it requested the Board to hold an evidentiary hearing. The record made before the examiner was, at petitioners' request, incorporated in the Caracas proceeding; and, on February 4, 1970, the Board heard oral argument in that matter as well as on the examiner's recommended decision with respect to the three fare proposals before him. The Board on February 27 decided both cases, and noted its denial of NACA's request for an evidentiary hearing on the Caracas agreement.

NACA's procedural point in this court takes as its point of departure a statement in *1970 NACA* to the effect that, although the Board is not required to hold an evidentiary hearing under Section 412, it should take steps to assure "an adequate factual input" as essential to "sound analysis." There was no such "input" here, says NACA, because the time was too short to admit of its being able to collect and present all relevant information, or to seek discovery of such information to the extent that it was not

otherwise accessible. Its principal claim of error in this respect is that it was denied the opportunity it had sought in the evidentiary investigation to get information which might have shown an antitrust violation in the sense of a concerted purpose to divert traffic from the supplementals, even to the point of driving them out of the North Atlantic business altogether.[3]

In this latter connection, NACA points to the examiner's denial of its request at the pre-hearing conference for a comprehensive collection of data and correspondence between the IATA carriers and IATA itself, between the IATA carriers *inter sese* and sovereign governments or official agencies, and between IATA carriers and tour agents or organizers. The examiner had denied this request because he thought it far exceeded the scope of the immediate investigation, in that it envisaged "a comprehensive investigation of the IATA carriers—supplementals competitive situation," or, in other words, was directed to the merits of the policy which contemplates fixing international air fares by agreement. This, NACA insists, made the evidentiary record inadequate as a basis for resolving the antitrust and other objections leveled by it against the Caracas agreement.

In his report of the pre-hearing conference, the examiner ruled that Pan American and TWA were required, as requested by NACA and the Board's Bureau of Operating Rights, to supply (1) detailed information with respect to costs, revenues, and traffic, and (2) copies of all intra-company papers bearing upon the reasons for, and the purposes to be achieved by, the fares in issue. He refused to make all of the foreign IATA carriers formal parties to the investigation, or to require submission of intercompany communications about the CBIT fares, communications by the IATA carriers to the IATA Charter Study Group, and documents involving

---

3. In addition to the American companies certified as supplementals, there appear to be some seven foreign carriers in the same business. Pan American and TWA are the only American members of the North Atlantic IATA Conference, but there are 16 foreign scheduled carriers in that group as well.

the European Civil Aviation Conference, an association of the officials of European states concerned with aviation.

The Board found no error in these rulings, nor do we. The examiner purported to be guided by the twin objectives of expeditious resolution of the defined issues, and an adequate record for that purpose. These were proper objectives, and we think the manner of their achievement did not fatally compromise the goal of a fair and informed decision of the issues to be investigated. What NACA was essentially denied was cost information from the foreign IATA carriers, and the opportunity to document an alleged intra-IATA concern about the growing competition from the supplementals. But it is obvious that petitioners are principally preoccupied with the costs and motivations of Pan American and TWA, which information was elicited; and we may assume that the IATA members generally were interested in meeting the increasing competition of the supplementals in the bulk transportation market.[4]

■ On December 21, 1969, there appeared in the press a full account of the agreements reached at Caracas. Those agreements were filed with the Board on December 29. On January 16, 1970, the Board issued its order calling for written submissions by interested parties within ten days to be followed by oral argument before the Board. NACA made such a submission and participated

in the argument, but it now asserts that the time was too short to afford a fair opportunity to analyze the Caracas agreements and to compile an adequate set of objections. We are not impressed with this claim.

When the "open rate" period began in October, 1969, it was evident to all that IATA would make an immediate effort to renew in substance the Dallas agreements. The Caracas conference was promptly convened. One day after the press report on December 21 of the conference's results, counsel for the Board wrote a letter to this court (because *1970 NACA* was then under submission) advising it that IATA at Caracas had largely readopted the Dallas agreements. Counsel for NACA, by a letter dated January 8, 1970, wrote to us challenging this characterization and pointing out what were alleged to be significant differences between the Dallas and Caracas agreements. It is against this backdrop that the adequacy of the 10-day submission period is to be viewed, and we do not find it wanting.[5]

The record made before the examiner was extensive in terms of both documentary and testimonial evidence.[6] It was, of course, compiled only by reference to the Dallas fare proposals committed by the Board to evidentiary inquiry, and did not expressly relate to the other challenged Dallas proposals which were approved by the Board only upon the basis of written submissions and oral argument. But the Dallas proposals to which

4. The Board found that the supplementals' compounded annual growth rate in the transatlantic market was 60% between 1963 and 1968, and that its share of the market went from 1.8% to 8.2% in that period.

5. No request for an extension of the submission period was made by petitioners, in contrast with the delay requested and obtained by them in connection with the Board's consideration of the Dallas agreements. Neither did petitioners seek leave to present rebuttal evidence with respect to the Pan American and TWA estimates of the traffic which would move under the respective Caracas fares—a matter as

to which it now urges that it was given no opportunity to test or to rebut.

6. As the Board points out in its brief in this court:

"The record included an abundance of testimonial and documentary evidence, including documentary submissions of IATA carriers to the IATA Conferences, intra-company memoranda and communications of IATA carriers with respect to them, minutes of the IATA meetings, costs of service, estimates of traffic, and diversion, average charter fares of NACA carriers across the Atlantic, market shares of NACA and IATA carriers in the transatlantic market, and financial condition of the carriers, to name but a few * * *."

it was directed were renewed without change at Caracas, and they included the one and only fare proposal of all which involved an increase in the rates to be paid by the travelling public and which, it may rationally be thought, was the most sensitive in terms of antitrust and the public interest. This was the elimination of the 5% round trip discount for individually ticketed passengers—a gambit which, so NACA asserts, was designed to enable the IATA carriers to subsidize, at the expense of the individual passengers, unduly low group fares designed to cut into the supplementals' charter business.

The three fares which were not the subject of evidentiary inquiry were the (1) affinity group fares, (2) incentive group fares, and (3) group inclusive tour fares. The last two of these were continued at Caracas without change. With respect to the former, the principal change at Caracas was to provide new and lower fares for larger groups.[7] With the exception of these changes in the affinity group fares, these three classes of group fares had been the subject of written submissions to the Board at the time the Dallas agreements were filed. They were again the subject of written submissions, as well as briefs and oral argument, in connection with the Board's examination of the Caracas agreements.

The Board, in finding that an evidentiary hearing was not essential to its ruling on the Caracas proposals, observed that these last contained fares which had been the subject of evidentiary inquiry, and that that record was "pertinent to other aspects of the Caracas agreement." It cited as an example in this regard the data in that record adduced by petitioners "as to their charter rates and traffic volumes on which we have relied herein." It pointed out that, even had a hearing

been held, it could not have illuminated in any meaningful manner "the effects of the new features of the Caracas agreement in terms of traffic generated and diverted, and revenues realized would remain at best a matter of judgment until the fares are actually used in the market place" during the 13 months they would be in effect.

Petitioners insist, at bottom, that the procedural deficiencies asserted by them are a product of the Board's determination to end, at all costs, the "open rate" crisis and to get the Caracas agreement into effect in accordance with its terms. We do not doubt that the Board was mindful of the values peculiarly inhering in the achievement of expedition in the resolution of this matter. Courts are pressed every day by litigants to speed up the decisional process in a particular case because of unusual pressures of time and circumstance. If we err on occasion in going too fast with too little, our fault does not reside in a mere consciousness of the desirability of expedition. The question, rather, is whether in fact we have placed a party at a substantial and serious disadvantage in presenting his case, or have denied to ourselves the materials requisite for a rational decision.

So it is with adjudication by an administrative agency like the Board. Putting the same question, we find no necessity to hold that its decision in this case has been nullified by defects in the proceedings leading up to it.

## II

■ As noted above, the one item in the fare proposals which involved an *increase* in the rates paid by the travelling public is the elimination of the 5% round trip discount. No representative of those who pay this increase are here complaining about it. We may presume that ordinarily the supplementals wel-

7. The Dallas affinity group fares were applicable to groups of 40 or more (50 or more in the peak season) under which the round trip New York-London fare was $200 in the off season, $212 in the shoulder season, and $250 in the peak season. Caracas continued these except for lowering the minimum number to 40 in all seasons. A new and lower fare was provided for groups with a minimum number of 80. For westbound travel only from West Germany, a new and still lower fare was adopted for groups of 100 or more.

come fare increases by the scheduled carriers, because that creates incentives for travellers to turn to the lower rates available through petitioners' special charter services. Petitioners' contrary reaction here is prompted by the fear that the IATA carriers have acted to cause the first-class and economy passengers to subsidize the scheduled carriers' attempt to compete more effectively in the group travel market.

The Board addressed itself to this concern. It found, however, that "there appears to be no substance to the claim that the purpose or effect of the discount elimination is the subsidization of the low fares as a competitive weapon against the supplemental carriers." The record shows that the North Atlantic individually-ticketed fares had been stable since 1962 and, by the end of 1968, the pressure of steadily rising costs had created a feeling among the IATA carriers that a fare increase was necessary. One witness testified that this sentiment crystallized at the Cannes conference (of which Dallas was a continuation) when, on the first day, all but seven carriers world-wide voted for the discount elimination as a means of bringing revenues into a better relationship with steadily advancing costs.

The Board looked in this connection to the rates of return of the two American members of IATA. Pan American, it was found, has been, in each year after 1966, below the 10.25 percent standard for large domestic trunk lines. TWA's experience had been different, but the combined returns of the two American members of IATA had been below the standard since 1968 and, for the latest 12 months, stood at 6.4%. Because of the existing sharply inflationary direction of the economy, the Board believed that further deterioration was the only realistic prospect.

The Board was not, however, dealing with rates of return in the context of a domestic rate case where it has the power to prescribe rates. It was deciding the central question of whether a rate agreed upon by all of the IATA carriers was adverse to the public interest; and

the rates of return of Pan American and TWA were only one factor—and not necessarily the most relevant one—in that determination. The Board, instead, viewed the discount elimination "as one part of a much larger fare package which, when viewed in its entirety, offers substantial benefits to the public." It noted that the adverse impact of the fare increase on the first-class and economy passengers was greatly lessened by two things. One was the enlargement of the scope of the individual excursion fares made at Dallas and extended at Caracas; and the other was the opportunities afforded to shift to the utilization of the new group fares, especially the inclusive tour.

The former is, of course, of much greater practical significance, as evidenced by the Board's estimates from the evidence that the percentage of Pan American and TWA passengers using the individual excursion fares would rise from 24% in 1968 to 38% under the Caracas fares. The actual experience under the temporary approval of the Dallas agreement had shown a 100% increase in the individual excursion and inclusive tour business of Pan American, with its economy class passengers dropping by 37%. Thus, the Board found the round trip discount elimination largely balanced by the liberalization of excursion fares, and, when taken together with the need for some greater contribution by the individually-ticketed passengers to rising costs, it could not find that the discount elimination was unreasonable.

Conscious as we are of the delicacies of the Board's responsibility to scrutinize international rate-making agreements by a general public interest standard while at the same time it lacks the traditional power to prescribe rates, we are unable to say that its conclusion in this respect is irrational. NACA's argument in this court to the contrary tracks the reasoning of the examiner, who in this one instance recommended disapproval. The examiner appears mainly to have been motivated by the fact that comparing the rates of return of the American members of IATA, Pan American "seems to

be a higher cost operator over the Atlantic than TWA. * * *" He was unimpressed by the claim that the financial position of the two carriers was deteriorating, and, indeed, asserted confidently that there would be "an improvement in the economic positions of both carriers in 1970 * * *," a prediction which, in the event, suggests that there had been some clouding up of his crystal ball. He rejected the possibility that there would be any significant off-setting of the fare increase by the other fare reductions, and, on this note, concluded that, since a concerted agreement to raise a rate is *per se* illegal under the antitrust laws, it could not, under the principles laid down by the Board in the Local Cartage Agreement Case, 15 C.A.B. 850, 853 (1952), be approved without a "showing of a serious transportation need or of important public benefits." [8]

Petitioners make much of the fact that the Board included in its statement of differences with the examiner its view that *Local Cartage* is not strictly applicable to each and every IATA-made fare. We are not convinced that the resolution of this difference is critical to our decision, since it is by no means clear to what degree the *Local Cartage* standard diverges from the statutory "public interest" requirement of Section 412; and, even by *Local Cartage,* it would appear that the Board here found that the statutory standard was met by evidence of both "transportation need" and "important public benefits."

██ What the Board meant, it seems to us, is that Section 412 applies to all manner of carrier agreements, not just those involving international air fares. *When one of such other agreements is filed, it may or may not be violative of the antitrust laws.* [9] If the Board finds that it is, it must not be approved without a showing of serious transportation need or important public benefits sufficient to overcome the antitrust violation. In the case of IATA fare agreements, however, the Board has already decided that the concerted making of fares by IATA, although clearly in conflict with antitrust principles, is not "adverse to the public interest" within the meaning of Section 412. Thus, the filing of an IATA fare agreement does not in each case present the Board with the threshold question of whether the agreement is a violation of the antitrust laws. So long as its earlier decision stands, the Board need not go over that ground again but may proceed directly to the question of its conformity to the statutory standard of adversity to the public interest.

Of course, if the Board finds that the particular IATA fare agreement before it is unfairly designed and directed in purpose and effect to the elimination of legitimate competitors, it is obviously out of keeping with the statutory standard. Here, the Board has found that the particular agreements before it are not so constituted. If that finding is supportable, there is no necessity for the Board to reopen, and to examine anew, the question of whether the IATA rate conference machinery is in the public interest.

The correct resolution of the conflicting findings of the Board and the exam-

---

8. This standard emerged from the Board's consideration of an agreement by a group of carriers to refuse to advance freight charges to non-affiliated local truckers for air cargo shipments sent C.O.D. The purpose of the agreement was to favor the local air freight pickup and delivery service offered by the individual air carriers, and its effect was to put the independent truckers out of the air freight business. The Board found the agreement to be an example of concerted action antithetical to the antitrust laws, the approval of which ought to be withheld in the absence of a showing of the kind indicated.

9. IATA agreements involving group boycotts, as distinct from concerted action on fares, have failed to secure the Board's approval. *See* IATA Credit Agreements, 30 C.A.B. 1553 (1960); IATA, Extension of Credit, 31 C.A.B. 1041 (1960); IATA Resolution re Visual In-flight Entertainment, C.A.B. Order E–22240 (1965). In each such case the Board had to decide first whether the particular agreement was contrary to antitrust principles, and then to determine whether, even if it was, there were overriding justifications.

iner do not, in our view, turn on their respective references to *Local Cartage*. For this *increase* in fare, as well as for the *decreases* involved in the remaining Caracas agreements, the propriety of what the Board has done is to be judged by our *1970 NACA* standard of "whether the existence of a market structure conducive to maximum feasible competition will be imperiled by approval of the agreement." So judged, the Board's approval of the discount elimination is sustained.

## III

NACA's attack upon the reasonableness of the group fares contained in the Caracas agreement is cast in terms of the alleged inadequacy of the Board's findings. It argued to the Board that the test in this regard should be whether the fares would recover the carriers' fully-distributed costs. The IATA carriers in turn pressed upon the Board a "profit-impact" standard, under which a fare falling short of fully-distributed cost may still be adjudged reasonable if it improves the net profits of the carrier, which it will do if it generates enough revenue to offset diversion from its higher fares and to cover the cost of carrying the additional traffic.

The Board, as we later said it could do in *1970 NACA*, rejected NACA's contention on fully-distributed costs. It also was not satisfied with the "profit-impact" test, which normally is applied individually to each fare. It thought that the best way to determine whether the Caracas agreement was approvable under Section 412 was to examine the relationship of each fare to the other fares in the total fare structure, and then to test its conclusions by looking to the volumes of traffic which could be fairly anticipated as moving under the various fares.

On the first level of inquiry, the Board noted that the IATA fare structure is "comprised of normal first-class and economy fares for unrestricted and one-way and round trip travel, two levels of individual excursion fares, one level for shorter trips and a lower level for longer trips, affinity group fares for groups of various sizes, fares for purposes of constructing group inclusive tours, and the contract bulk (CBIT) fares on which individual or group tours are based." It found that the fares assigned in this structure reflect both "the relative value of the services offered, as well as individual and aggregate costs of service." The unrestricted normal fare service was found correctly to be priced the highest, since the absence of restrictions warranted the imposition on these passengers of a relatively larger burden of meeting the total costs of this service. The other fares went down in accordance with a scale of reduced values of the services offered. The construction of this scale is a function of judgment brought in good faith to bear on considerations both of cost and of demand.

From the data in the record, the Board compiled this table of the expected distribution of Pan American and TWA traffic under the Caracas agreement as compared with their 1968 traffic:

Distribution of Economy Traffic by Fare Category, Pan American/TWA Combined

| Fare Category | 1968 | | Estimated for Caracas Agreement | |
|---|---|---|---|---|
| | Number of Passengers | Percent of Total | Number of Passengers | Percent of Total |
| | (000) | | (000) | |
| Normal economy | 910 | 51.1% | 824 | 34.6% |
| Excursion | 422 | 23.7 | 904 | 37.9 |
| Group inclusive tour | 130 | 7.3 | 185 | 7.8 |
| Affinity group | 78 | 4.4 | 204 | 8.6 |
| Other discount | 237 | 13.5 | 266 | 11.1 |
| Total economy | 1,777 | 100.0% | 2,383 | 100.0% |

What will be immediately remarked is that the biggest shift occurs in respect of individually-ticketed economy class passengers. This indicates that many members of the travelling public will get the benefit of lower fares in the excursion rates, and that the elimination of the round trip discount will, for many passengers, be offset by the opportunity to continue travelling individually but in a service which is less attractive and valuable because of the attendant restrictions. Obviously, some of these people, with a distaste for group travel, would not have travelled at all without the excursion offering.

Those who are able or willing to countenance the restrictive features of group travel may travel at still lower rates, but it will be seen that these offerings do not constitute anything like the major proportion of air travellers, and the estimated shifts are by no means dramatic. The affinity group travellers are expected to double because of the lower rates for larger groups, but it is also clear that this will represent diversions from the charter services now supplied by both the IATA scheduled carriers and the supplementals, domestic (i. e., petitioners) and foreign.

The Board concluded that this pattern of traffic distribution "does not suggest that the group fares are unduly low or that the carriage of such traffic would have to be subsidized by other traffic." It believed that the group fares would develop new sources of traffic and revenues to share in the over-all costs of service.

The Board addressed itself to the essential concern of petitioners, namely, that the affinity group fares would take away a devastatingly large share of their business, which is mainly in this area and which amounts to 45% of this market. The Board, however, remarked the sensitivity of travellers in this area to price differentials and their alertness to shop for bargains. Such bargains remain under the Caracas agreement, said the Board, because there continue to be dif-ferentials of 20 to 30 percent in favor of the supplementals.

The Board, on the basis of the evidence, estimated that the predicted 3.8% rise in the affinity group traffic of Pan American and TWA foreshadowed at most a diversion of less than 10% of the one million charter passengers estimated for 1968 by petitioners. The Board did not regard this as anything like a death knell for the supplementals who, being free of rate regulation and the costs of flying fixed schedules, could continue their highly successful competition with the IATA carriers for the North Atlantic trade. What the supplementals would have more to fear was the competition of strong IATA carriers, including the 16 foreign lines, in an open-rate situation.

Rate regulation is never an act of mathematical precision, even when the agency has the power to prescribe, as the Board does not have here, the rates which must be charged as fair and reasonable. It is infinitely less so under the present scheme authorized by Congress for international air fares. There are many intangibles, even that of international politics, which the Board must cope with in trying to assure for American carriers, scheduled and supplemental alike, an adequate role in this volatile business. In this matter of the reasonableness of the Caracas fare proposals, the Board appears to us to have deliberated rationally. The results it has reached do not, in our judgment, unacceptably endanger "the existence of a market structure conducive to maximum feasible competition." That is the highest and best definition of both our national and consumer interest in the conditions under which international air transportation is to be carried on.

### IV

■ In this court petitioners complain of the CBIT's, the affinity group fares, the group inclusive fares, and the California proportional fares, as unjustly discriminatory and unduly preferential under Sections 404(b) and 1002(f) of the

Act. 49 U.S.C. §§ 1374(b), 1482(f). The first and last of these enumerated fares were, of course, the subject of evidentiary investigation. The examiner found each of them to be valid; the Board agreed; and no representatives of the interests alleged to be discriminated against are here lamenting their plight.

The issues bearing upon discrimination explored by the examiner with respect to the CBIT's were two in number. The first was that of the benefits afforded by them to the travelling public. The examiner found that these fares were the lowest ever offered in North Atlantic service, and accordingly advanced the Board's established goal of lower international fares. They would, he said, open up the possibility of foreign travel to a large number of persons who would not otherwise engage in it. This would make for an expanding base of traffic admitting of better service to those who would travel abroad in any event, and they would contribute to the strength of the American IATA carriers.

Secondly, the examiner looked to their competitive impact upon the supplementals, recognizing that the economic health of both the scheduled carriers and the supplementals was a persisting concern of the Board. He found from the evidence that the CBIT's did not present anything like a critical danger to the supplementals. This was because the inclusive tour operations of the supplementals were not a significant part of their operations. In terms of impact upon the affinity group business of the supplementals, he found no reason for supposing that passengers in that category would have any real incentive to switch to the more restrictive terms of the CBIT's. He noted that the Board, although at one time doubtful of the tour-based feature, had latterly abandoned its professed concern over its discriminatory aspects. The Board adopted the examiner's recommendation and his reasoning. We find no error in its so doing.

With respect to the California proportionals, which petitioners alleged to favor unduly Los Angeles and San Francisco passengers as compared with passengers starting or completing their journeys at other cities in the United States, the examiner found these to be a reasonable response to the heavy preemption by the supplementals of California-Europe travel because of the direct single-plane service they were offering. The Board embraced the examiner's recommendation on this score, including his findings that the proportional fares had the effect of bringing the California-Europe fares into line on a per-mile basis with the New York-Europe fares.

To petitioners' complaint that other American cities were being discriminated against, the Board noted that none of such cities was complaining, and that there were problems about adopting equal per-mile fares to all interior U.S. points which most IATA carriers are not authorized to serve. Petitioners argue to us that the IATA carriers can compete for the California business through special charter service rather than by seeking proportional rates which will put California passengers in the vacant seats on their scheduled flights from New York. We are not persuaded, however, that the Board was required to mandate competition on these economically inefficient terms.

NACA's objection to the group inclusive tour fares is essentially the same as that made to the CBIT's, and, having upheld the Board's approval of the latter fares against the charge of discrimination, we do not pursue the matter further. The affinity group fares are attacked because of the affinity requirement. As long ago as 1962, however, the Board accepted the affinity principle as necessary to prevent the catastrophic degree of diversion from regular fares which would happen if low-fare groups could be formed from the general public. 36 C.A.B. 33 (1962). The Board then recognized the discriminatory nature of this fare in relation to people having no affinity ties, but it found this overbal-

anced by the substantial public interest considerations of developing larger utilization of air transport. The Board reaffirmed in the order before us its acceptance of these principles, negating petitioners' argument that the 1962 decision had been a crash program which the Board had later intimated was temporary in character.

The affinity principle is, of course, a legal requisite of the charter services offered by both the supplementals and the IATA carriers. There is absolutely no reason to think that Congress regards it as beyond the scope of the Board's authority to approve. It has brought about a large and growing body of air travellers who might not otherwise be in the market. The Board found that it was in the public interest for the scheduled flights to have some opportunity to share in this market. We do not think that the discrimination provisions of the Act foreclose the Board from making this judgment.[10]

As we issue this opinion, the effective period of the Caracas agreement will be reaching its end. It is obvious that the North Atlantic air transport business is one which changes fast and where the certainties of one day become the question marks of another. One consequence of the IATA method of reaching agreements for limited periods of time is that the Board has periodic opportunities to review the new fare structures and their competitive impact in the light of actual experience with their predecessors. In the case before us, the Board has essentially made both a judgment and a prediction, namely, that the "supplemental

carriers, while subjected to more intensive competition, have the capability to respond effectively, and that competition is not unfair nor destructive." We think the Board acted rationally in this instance, but rationality alone gives the Board no guarantee of the course of future events. What remains constant is the Board's periodic responsibility to further the national policy which contemplates "the existence of a market structure conducive to maximum feasible competition."

The orders of the Board under review are

Affirmed.

10. Subsequent to the oral argument of this appeal, petitioners brought to our attention an "Advance Notice of Proposed Rule Making—Non-Affinity Charter," issued by the Board on January 29, 1971. It announces that the Board is presently considering the promulgation of rules, applicable to the charter services of both the supplementals and the scheduled carriers, which would relax substantially the existing affinity restrictions. In the accompanying Explanatory Statement, the

Board indicates its familiarity with the asserted "infirmities of the affinity charter concept," including the problems of discrimination inherent in the affinity principle. We think that the pendency of this rule making proceeding, demonstrating as it does the agency's recognition of the particular public interest issues surrounding the affinity principle, reinforces us in leaving this matter to the Board's discretion in the group fare issue before us.