489 F.2d 614
 Dusan SPACIL, Ambassador of the Czechoslovak Socialist
Republic, Petitioner,
v.
The Honorable Guthrie F. CROWE, United States District Court
Judge for the District of the Canal Zone, et al.,
Respondents.
 No. 73-3599.
 United States Court of Appeals, Fifth Circuit.
 Feb. 13, 1974.
 
 Leonard B. Boudin, Michael Krinsky, New York City, Bruno Ristau, Atty., Dept. of Justice, Civil Div., Washington, D.C., for petitioner.
 Guthrie f. Crowe, Judge, Balboa Heights, Canal Zone, Robert E. Herzstein, Washington, D.C., Betty Olchin, Balboa, Canal Zone, Donald W. Doyle, Howard J. Smith, Donald W. Doyle, Jr., New Orleans, La., for respondents.
 Before WISDOM, AINSWORTH and CLARK, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This case concerns executive preemption of the decision to grant a foreign sovereign immunity from suit in our courts.
 
 
 2
 On November 13, 1973, we granted a petition for a writ of mandamus in this action, directing the district court for the district of the Canal Zone 'to order the release of the vessel 'M/V Imias' and to refrain from exercising any jurisdiction over that ship and over the action entitled Industria Azucerera Nacional, S.A., et al v. Empresa Navegacion Mambisa'. Because of the urgency of the matter, we granted the petition without then stating our reasons in an opinion. We now state the reasons for our order granting the writ.
 
 I.
 
 3
 The controversy grew out of the recent military coup in Chile. On September 11, 1973, a military junta overthrew the government of President Salvador Allende Gossens. That same day the M/V Playa Larga, a vessel owned by the Cuban corporation Empresa Navegacion Mambisa (Mambisa), abruptly left Chilean waters.[1] The Playa Larga had transported raw sugar from Cuba and had only partially unloaded its cargo at a pier in Valparaiso. The vessel left port so precipitately that it still had on board four unloading cranes owned by the Chilean corporation, Compania de Refineria de Azucar de Vina del Mar (Refineria). After leaving Chilean territory on September 11, the Playa Larga was damaged by strafing from Chilean Air Force planes and shelling from a Chilean destroyer. A second Mambisa vessel, the M/V Marble Island, also transporting sugar from Cuba, abandoned its course for Chile on September 12, 1973.
 
 
 4
 The sugar carried by both the Playa Larga and the Marble Island was consigned to Industria Azucarera Nacional, S.A. (Azucarera), a Chilean corporation. Azucarera instituted a breach of contract action against Mambisa in the Canal Zone district court, contending that it had fully paid for the sugar. Refineria joined as plaintiff, asserting a claim for the conversion of the four cranes carried off by the Playa Larga. The claims totaled more than $4 million. On October 2, 1973, the District Court for the Canal Zone issued a writ attaching the M/V Imias.
 
 
 5
 The Czechoslovak Ambassador, Dusan Spacil, representing the interests of Cuba in the United States, promptly requested the State Department to file a suggestion of immunity in the district court urging the release of the Imias and the dismissal of the action. In conformity with established procedures,[2] members of the Legal Adviser's Office of the State Department heard arguments on behalf of the parties. On October 25 the Legal Adviser apprised the Attorney General of the United States of the State Department's decision:
 
 
 6
 'The Department has been informed by the Embassy of the Czechoslovak Socialist Republic, as representative of the interests of the Government of the Republic of Cuba in the United States of America, that the M.N. Imias is a vessel belonging to the Government of Cuba and that the Government of Cuba requests that the said vessel be granted immunity from the jurisdiction of United States courts.
 
 
 7
 The Department recognizes and allows immunity of the M.N. Imias from the jurisdiction of United States courts for the purpose of arrest, attachment, suit, or any other legal process in the above captioned action.
 
 
 8
 The Department would be grateful to you if you would cause an appropriate suggestion of immunity to be filed with the United States District Court for the Canal Zone.'
 
 
 9
 In compliance with this request, the United States Attorney for the Canal Zone, at the direction of the Attorney General, certified a suggestion of immunity to the court, stating:
 
 
 10
 '(The issue of immunity) arises in connection with a determination reached by the Executive Branch of the Government of the United States in the implementation of its foreign policy and in the conduct of its international relations, which determination should be given effect by this Court.'
 
 
 11
 Counsel for the plaintiffs requested an opportunity to appeal to the Secretary of State the Legal Adviser's decision to recognize and allow the claim of immunity. Counsel also requested a statement of the reasons for the Legal Adviser's decision. The Legal Adviser responded:
 
 
 12
 'The Department's decision to recognize and allow immunity in this case was made on the basis of the most careful consideration of all the circumstances and after appropriate consultation by the Office of the Legal Adviser with the other interested bureaus and officials in the Department. The Department's practice in sovereign immunity cases does not provide for an appeal, or any presentation by counsel, to the Secretary of State. The Department's decision has been taken, and, it is the Department's view that the public interest and United States foreign relations are best served by the prompt release of the vessel.'
 
 
 13
 On November 1, 1973, the district court granted the defendant's motion to dismiss the suit and to release the Imias on grounds of sovereign immunity. The district judge stated orally in open court, however, that he would defer the entry of the order until November 5 and that if the plaintiffs posted a $25,000 bond the court would stay the effectiveness of the order pending appeal. The defendant petitioned for writs of mandamus and prohibition, seeking an order of this Court to require the district court to dismiss the action and order the immediate release of the vessel. The defendant and plaintiffs filed briefs in this Court. In addition, the United States filed a brief in support of the petition. Meanwhile the plaintiffs posted the bond, and the district court stayed the effectiveness of the order. This Court permitted counsel for the plaintiffs and the defendant and a representative of the United States to argue the case on November 12. The following day we granted the writ.
 
 II.
 
 14
 An accepted rule of law is that courts should recognize the immunity of a foreign sovereign. 'Historically the rule may be traced to a time when most states were ruled by a personal soverign who, in a very real sense, personnified the State-- 'L'Etat C'est moi". Draft Convention of the Competence of Courts in Regard to Foreign States, 26 Am.J.Int'l L. 451, 527, no. 1. The doctrine of foreign sovereign immunity cuts across the rights of individuals when governments engage in commercial or industrial activities reserved in many countries for private enterprise. In applying the doctrine in any particular case the judiciary must be sensitive to the overriding necessity that courts not interfere with the executive's proper handling of foreign affairs.
 
 
 15
 From the early days of the Republic to the present, the United States judiciary has bowed to suggestions by the executive that certain suits against foreign sovereigns should not be entertained in United States courts. In the famous case of The Schooner Exchange v. McFaddon, 1812, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287, where the Supreme Court first enunciated the doctrine of immunity for foreign sovereigns, Chief Justice Marshall said: 'There seems to be a necessity for admitting that the fact (of immunity) might be disclosed to the court by the suggestion of the attorney for the united states.' 11 U.S. at 147.
 
 
 16
 The Supreme Court has stated the principle forcefully in later decisions. Writing for the Court in Compania Espanola De Navegacion Maritima v. The Navemar, 1938, 303 U.S. 68, 74, 58 S.Ct. 432, 82 L.Ed. 667, Justice Stone stated unequivocally that the courts would be bound by a claim of sovereign immunity 'recognized and allowed' by the executive branch: 'It is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction.' This characterization of the function of the judiciary when faced with an executive suggestion of immunity was echoed in Ex parte Peru, 1943, 318 U.S. 578, 588, 63 S.Ct. 793, 87 L.Ed. 1014:
 
 
 17
 'Courts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarrass the executive arm of the government in conducting foreign relations . . .. The judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune . . .. Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations.'
 
 
 18
 More recently, the Second and Fourth Circuits have reiterated that once the State Department has determined that immunity is warranted, and has submitted that ruling to the court through a suggestion, the matter is for diplomatic rather than judicial resolution. The suit must be dismissed, and any property attached must be released. Isbrandtsen Tankers, Inc. v. President of India, 2 Cir. 1971, 446 F.2d 1198, cert. denied, 404 U.S. 985, 92 S.Ct. 452, 30 L.Ed.2d 369; Rich v. Naviera Vacuba, S.A., 4 Cir. 1961, 295 F.2d 24.
 
 
 19
 The precedents are overwhelming. For more than 160 years American courts have consistently applied the doctrine of sovereign immunity when requested to do so by the executive branch.[3] Moreover, they have done so with no further review of the executive's determination. The Supreme Court in Ex parte Peru declared that the State Department's suggestion must be accepted by the judiciary as 'a conclusive determination' that continued retention of jurisdiction would jeopardize foreign relations. 318 U.S. at 589. The Fourth Circuit was even more pointed in Rich v. Naviera Vacuba, S.A., placing the unquestioning acceptance of the State Department's decision that immunity should be granted on a constitutional footing. The Court said:
 
 
 20
 'We conclude that the certificate and grant of immunity issued by the Department of State should be accepted by the court without further inquiry . . .. We think that the doctrine of the separation of powers under our Constitution requires us to assume that all pertinent considerations have been taken into account by the Secretary of State in reaching his conclusion.'
 
 
 21
 295 F.2d at 26. In the face of these authorities, the plaintiffs ask us to depart from the historic practice of granting unquestioned discretion to the executive. We decline to do so.
 
 
 22
 The plaintiffs' primary contention concerns the applicability of the Administrative Procedure Act, 5 U.S.C. 551-559, 701-706. Their argument runs as follows. The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court', 5 U.S.C. 704, and 'exemptions from the . . . Administrative Procedure Act are not lightly to be presumed', Marcello v. Bonds, 1955, 349 U.S. 302, 310, 75 S.Ct. 757, 99 L.Ed. 1107. With several exceptions that are not material here, 'agency' is defined as any 'authority of the Government of the United States', 5 U.S.C. 701. This is clearly broad enough to cover the State Department. See Rusk v. Cort, 1962, 369 U.S. 367, 375, 82 S.Ct. 787, 7 L.Ed.2d 809. 'Agency action', similarly broadly defined, 'includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act'. 5 U.S.C. 551. As 'agency action' and as 'final' for purposes of review, cf. Brownell v. We Shung, 1956, 352 U.S. 180, 185, 77 S.Ct. 252, 1 L.Ed.2d 225, the plaintiffs maintain, a suggestion of immunity is subject to judicial review under Title 5, section 706, of the United States Code. The plaintiffs cite holdings that judicial review of final agency action will not be cut off unless there are persuasive reasons to believe that such was the intent of Congress. Abbott Laboratories v. Gardner, 1967, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681; Barefield v. Byrd, 5 Cir. 1963, 320 F.2d 455, 458; cert. denied, 376 U.S. 928, 84 S.Ct. 675, 11 L.Ed.2d 624.
 
 
 23
 Although the life of the Administrative Procedure Act, promulgated in 1946, spans decisions of both the Supreme Court and Circuit Courts holding executive determinations dealing directly with foreign relations beyond judicial competence,[4] we do not view this fact as disposing automatically of the plaintiffs' argument that the review provisions of the Act apply. The applicability of the APA has apparently never been considered in this context. The issue is sufficiently important to require analysis here. Congress has not specifically provided, in the Administrative Procedure Act or elsewhere, for review of State Department decisions to recognize and allow a claim of sovereign immunity. The question, then, is whether the presumption of review accorded most agency action obtains. For the reasons set out below, we conclude that it does not.[5]
 
 
 24
 We pause for two caveats. First, we are analyzing here the proper allocation of functions of the branches of government in the constitutional scheme of the United States. We are not analyzing the proper scope of sovereign immunity under international law. Second, although the Constitution gives the responsibility for the conduct of the nation's foreign affairs entirely to the executive and Congress,[6] this well-recognized fact does not itself foreclose judicial determination of cases which may have some foreign relations impact. See Baker v. Carr, 1962, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663. We do not doubt the propriety of courts deciding questions of sovereign immunity, absent executive recognition and allowance of a claim. This has been the traditional and accepted practice of the courts. See, e.g., Mexico v. Hoffman, 1945, 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729; Exparte Peru, supra, 318 U.S. at 587-588; Compania Espanola De Navegacion Maritima v. The Navemar, supra, 303 U.S. at 75. See also Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517, 541-48 (1966). But different considerations come into play when the executive has made its determination clear.
 
 
 25
 When the executive branch has determined that the interests of the nation are best served by granting a foreign sovereign immunity from suit in our courts, there are compelling reasons to defer to that judgment without question. Separation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy. United States v. Lee, 1882, 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171. And the degree to which granting or denying a claim of immunity may be important to foreign policy is a question on which the judiciary is particularly ill-equipped to second-guess the executive. The executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary. See Chicago & S.Air Lines, Inc. v. Waterman S.S. Corp., 1948, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568; United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255. Perhaps more importantly, in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves. Will graning immunity serve as a bargaining counter in complex diplomatic negotiations? See Falk, The Role of Domestic Courts in the International Legal Order, 39 Indiana L.J. 429, 440 (1964). Will it preclude a significant diplomatic advance; perhaps a detente between this country and one with whom we are not on the best speaking terms? These are questions for the executive, not the judiciary.
 
 
 26
 Even if the decision to recognize and allow a claim of immunity is within the executive's discretion, the plaintiffs argue, the Sate Department must explicate the reasons behind its decision; only then can the judiciary properly be confident that the executive has exercised its discretion within the bounds of reasonableness. Here, the State Department has provided neither the plaintiffs nor this Court with the basis for its decision. We know only that in the State Department's view 'the public interest and United States foreign relations are best served by the prompt release of the vessel'.
 
 
 27
 The plaintiffs attempt to bring in an established principle of administrative law. In typical review of government action the court ensures that the agency has not acted arbitrarily or capriciously, see, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 1971, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136; that the agency has followed its own rules, see, e.g., Service v. Dulles, 1957, 354 U.S. 363, 77 S.Ct., 1152, 1 L.Ed.2d 1403; United States ex rel. Accardi v. Shaughnessy, 1954, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681; and that the agency has taken a "hard look' at the salient problems', Greater Boston Television Corp. v. FCC, 1971, 143 U.S.App.D.C. 383, 444 F.2d 841, 851, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701. To permit this review, of course, it is necessary that agencies disclose the bases of their decisions. FPC v. United Gas Pipe Line Co., 1968, 393 U.S. 71, 73, 89 S.Ct. 55, 21 L.Ed.2d 55. We have no quarrel with this line of cases. But it narrow band of government action narrow band of governmenr action where foreign policy interests are direct and substantial we must eschew even limited 'reasonableness' review.[7] To require the executive to enlighten us with the foundation of its decision to recognize and allow a claim of sovereign immunity might itself create a serious risk of interference with foreign relations.
 
 
 28
 It cannot be disputed that some legitimate diplomatic maneuvers demand total secrecy. As President Washington observed long ago:
 
 
 29
 'The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers.'
 
 
 30
 1 Messages and Papers of the Presidents 194 (1897). We can visualize situations where the disclosure that negotiations are ongoing, or even contemplated, would wreak havoc with foreign relations. We simply dare not risk this sort of interference. The Supreme Court has noted that 'it would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret'. Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., supra, 333 U.S. at 111. Only if we permit an executive suggestion of immunity to preempt completely judicial consideration of the question can we be certain that we are not encroaching upon the executive's prerogative in foreign affairs.
 
 
 31
 It is the legitimate role of secrecy in foreign relations which, more than any other factor, distinguishes executive decisions directly concerning foreign policy from other agency action and makes judicial review peculiarly inappropriate in the former instance. Disclosure of the foundation of decision-making does not usually interfere with legitimate agency activities. But in foreign affairs, where the success of a ligitimate policy may depend on secrecy, disclosure of the reassons for recognition and allowance of a claim may itself defeat that policy. We hold, therefore, that the executive's decision to recognize and allow a claim of foreign sovereign immunity binds the judiciary, and that no further review of the executive's action is dictated by the Administrative Procedure Act.[8] It has been called a 'sound principle that on occasion individual litigants may have to forego decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy'. First National City Bank v. Banco Nacional de Cuba, 1972, 406 U.S. 759, 769, 92 S.Ct. 1808, 32 L.Ed.2d 466. (Rehnquist, J., joined by Burger, C.J., and White, J.). This is one of those occasions.
 
 III.
 
 32
 The plaintiffs also contest the use of mandamus. They would have us deny the petition and force the case into the traditional appellate mold. In other words, the Imias would remain anchored in the Panama Canal, subject to the district court's jurisdiction, at least until an appeal to this Court had been resolved. We fail to see how the interests of justice would be served by such a procedure in this case.
 
 
 33
 Mandamus generally does not lie where there is another remedy available. Ex parte Fahey, 1947, 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041. But the rule is not inflexible. In Exparte Peru, supra, 318 U.S. 578, the Supreme Court granted the petitioner's motion for leave to file for a writ of mandamus to compel the district court to relinquish jurisdiction pursuant to a suggestion of immunity filed by the State Department. The State Department had recognized and allowed a claim of immunity for a Peruvian steamship, but the district court had refused to dismiss the action on the ground that Peru had waived its immunity by seeking extensions of time in which to answer and by taking a deposition of the master of the vessel. Peru petitioned directly to the Supreme Court. Rather than relegaing the petitioner to the Court of Appeals, from where it might have been necessary to bring the case to the Supreme Court again by certiorari, the Court held that because the case was of 'such public importance and exceptional character' issuance of the writ was called for. Id. at 586. The Court further explained:
 
 
 34
 'When the Secretary (of State) elects, as he may and as he appears to have done in this case, to settle claims against the vessel by diplomatic negotiations between the two countries rather than by continued litigation in the courts, it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court. If the Republic of Peru has not waived its immunity, we think that there are persuasive grounds for exercising our jurisdiction to issue the writ in this case and at this time without requiring petitioner to apply to the circuit court of appeals.'
 
 
 35
 Id. at 587. This use of the writ to avoid 'unwarranted judicial action' which 'threaten(s) to embarrass the executive arm of the government in conducting foreign relations' was reaffirmed in Will v. United States, 1967, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305.
 
 
 36
 Circumstances similar to those in Ex parte Peru call for our similar resolution of this suit.
 
 
 37
 We cannot ignore the possibility of a crisis in international relations stemming from any delay in implementing the State Department's suggestion of immunity. Although we are aware of no 'crisis' in this instance, we may not demand that international relations create a cause celebre before we require the district courts to follow the time-honored practice of releasing a vessel upon the State Department's recognition and allowance of immunity and the filing of an appropriate suggestion with the court. The national interests that compel us to permit the executive unreviewable discretion to determine that sovereign immunity is necessary to foreign policy compel us to comply with that determination with great dispatch.
 
 
 38
 We can see little benefit to be derived from requiring the parties to reargue the merits on appeal. The positions of the parties on the merits were fully set out in lengthy written briefs and in extended oral argument. Furthermore, the case avoids the most pressing reasons for the traditional reluctance of appellate courts to issue mandamus. There is no danger of piecemeal litigation. See Parr v. United States, 1956, 351 U.S. 513, 76 S.Ct. 912, 100 L.Ed. 1377. Nor is there danger of upsetting any notions of comity between this Court and the district court by 'making the judge a litigant'. Ex parte Fahey, supra, 332 U.S. at 260. Although the respondent in this action, the district judge regarded this case as just another appeal.[9]
 
 
 39
 The real parties are as they would have been on appeal. The same issues have been considered. The defendant has shown that his right to the writ is 'clear and indisputable'. Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106.
 
 
 40
 So ordered.
 
 
 
 [1]
 According to Mambisa, the Playa Larga was approached and threatened by Chilean naval vessels on the morning of September 11, and a member of the crew was arrested by a military patrol while ashore. In the early evening, the master of the vessel, fearing for the security of the vessel and its crew, took the ship out of Chilean territory
 
 
 [2]
 State Department procedures provide for acceptance of memoranda from both parties and, at the request of either party, an informal hearing. Representatives of both parties may attend the hearing to present their views to a panel of members of the Office of the Legal Adviser. No presentation of evidence or testimony is permitted. No transcript is made of the proceedings. See 64 Am.J.Int'l L. 650 (1970)
 
 
 [3]
 There have been exceptions to this practice, but they have been extremely rare. See, e.g., Stephen v. Zivnostenska Banka Nationale Corp., 1962, 12 N.Y.2d 781, 235 N.Y.S.2d 1, 186 N.E.2d 676
 
 
 [4]
 See, e. g., National City Bank v. China, 348 U.S. 356, 358, 75 S.Ct. 423, 99 L.Ed. 389; Isbrandtsen Tankers, Inc. v. President of India, supra, 446 F.2d at 1201; Rich v. Naviera Vacuba, S.A., supra, 295 F.2d at 26. See also Davis, Administrative Arbitrariness-- A Postscript, 114 U.Pa.L.Rev. 823, 832 (1966)
 
 
 [5]
 See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 1948, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401, 769, 778 (1958). See also Davis, Administrative Arbitrariness Is Not Always Reviewable, 51 Minn.L.Rev. 643 (1967)
 
 
 [6]
 Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., supra, 333 U.S. at 111; United States v. Pink, 1942, 315 U.S. 203, 222, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont, 1937, 301 U.S. 324, 328, 57 S.Ct. 758, 81 L.Ed. 1134; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 302, 38 S.Ct 309, 62 L.Ed. 726
 
 
 [7]
 We do not mean to imply that any agency action touching foreign relations, however tenuously, is entitled to a presumption against review. We agree with the District of Columbia Circuit that a government agency 'cannot wrap its decision(s) in some mystique of foreign policy or purported expertise in international negotiation to achieve a nonreviewable status for th facts underlying its most important and sensitive decisions'. Pillai v. CAB, D.C.Cir.1973, 485 F.2d 1018, 1023. On the other hand, even that Circuit apparently would agree with us that decisions bound up with substantial foreign policy questions are not reviewable. In Peoples v. United States Department of Agriculture, 1970, 138 U.S.App.D.C. 291, 427 F.2d 561, 567, the Court said: 'The general rule, subject only to rare exceptions, (is) that the action of a government agency in the domestic sphere, as contrasted with actions in the spheres of foreign affairs or national security, is subject to judicial review for arbitrariness and abuse of discretion'. Compare Pillai v. CAB, supra; National Air Carrier ass'n v. CAB, 1971, 143 U.S.App.D.C. 140, 442 F.2d 862; National Air Carriers Ass'n v. CAB, 1970, 141 U.S.App.D.C. 31, 436 F.2d 185 (CAB decisions approving international air line rates are reviewable) and Rusk v. Cort, 1962, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (decisions by the State Department denying passport renewal are reviewable) with Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., supra, 333 U.S. 103 (orders of the CAB, approved
 
 
 [4]
 See, e.g., National City Bank v. China, to engage in overseas and foreign air transportation are not reviewable) and United States v. Pink, supra, 315 U.S. 203 (decisions by the State Department to grant or deny diplomatic recognition to foreign nations are not reviewable)
 There is no question of the tight relationship between foreign policy and the State Department's decision to certify a suggestion of immunity to the courts. See Ex parte Peru, supra, 318 U.S. at 587. Indeed, the political aspects of such a decision are inescapable. The State Department has found that it cannot deny a claim of immunity without risking adverse effects on foreign relations. Thus the Administration has sought legislation transferring to the courts the responsibility for determining whether a claim of immunity should be honored. See H.R. 3493, 93d Cong., 1 Sess. (1973). The bill would take the State Department out of the business of suggesting immunity to the courts. Hearing on H.R. 3493 Before the Subcomm. On Claims and Governmental Relations of the House Comm. On the Judiciary, 93d Cong., 1 Sess. 34 (1973).
 
 
 [8]
 In 1952 in a letter to Acting Attorney General Philip B. Perlman, Acting Legal Adviser Jack B. Tate announced that the State Department would generally adhere to the restrictive theory of sovereign immunity, recognizing immunity for public acts of a foreign sovereign (jure imperii) and denying immunity for commercial acts (jure qestionis). 26 Dep't State Bull. 984 (1952). The Tate letter has never been officially abandoned, and in correspondence with the plaintiffs' counsel, the State Department implied that the standards outlined in the Tate letter would be applied to the instant situation. The plaintiffs contend that it is impossible to tell whether the State Department applied the standards of the Tate letter, and that, in fact, it appears that the Department used some other standard. The defendant argues that the Tate letter is a quide to State Department policy, not an unalterable rule. See the Solicitor General's comments in the memorandum for the United States in opposition to the application to the Supreme Court for a stay in Rich v. Naviera Vacuba, S.A., supra. Because we hold that the executive's decision to recognize and allow a claim of sovereign immunity is unreviewable, we need not enter this debate
 
 
 [9]
 The district court concluded that the suit should be dismissed in accordance with Exparte Peru, supra, 318 U.S. 578, but stated its desire that the plaintiffs have 'an opportunity to have a ruling from the Appellate Court'. In ordering the stay, the district court seemed to contemplate and invite the plaintiffs to obtain review of the case through the most expeditious means: 'I guess what you would do would be to go to the Court of Appeals and get a writ of prohibition or something of that kind. I don't know what your procedure is going to be to get to the Court of Appeals.'