**CIVIL AERONAUTICS BOARD,**
Appellee,

v.

**CAREFREE TRAVEL, INC., et al., Appellants.**

No. 660, Docket 74–2431.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1975.

Decided March 7, 1975.

Howard S. Boros, Washington, D. C. (Mark Pestronk, Boros & Garofalo, P.C., Washington, D. C., of counsel), for appellants.

Neil H. Koslowe, Atty., Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., David G. Trager, U. S. Atty., E. D. N. Y., William Kanter, Atty., Dept. of Justice, James W. Tello, Atty., C. A. B., Washington, D. C., of counsel), for appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by four corporations and five individuals from a preliminary injunction issued in an action by the Civil Aeronautics Board (CAB) to prevent violations of the Federal Aviation Act of 1958 (the Act), 49 U.S.C. §§ 1301–1542,

and CAB regulations thereunder, relating to so-called "affinity charters." The appeal involves an important question relating to the jurisdiction of the district court to refer the preliminary injunction question to a magistrate, as well as assorted procedural questions and the usual preliminary injunction questions concerning probability of success on the merits, the public interest, and irreparability of harm. In connection with the probability of success issue appellants urge, *inter alia,* unconstitutionality of the Act and regulations as applied to them. For reasons that will appear we hold that it was within the power of the district court under the circumstances of this case to refer the case to the magistrate as a special master and we hold that the preliminary injunction was properly issued. We accordingly affirm the judgment below of the United States District Court for the Eastern District of New York, Orrin G. Judd, *Judge.*

## I. THE QUESTION OF THE REFERENCE.

This action was originally brought by the CAB against 14 corporate defendants and 19 individual principals of the corporate defendants for injunctive relief to prevent their selling airplane passage on charter flights allegedly in violation of CAB regulations. Consent injunctions were granted against six corporate defendants and eight individuals. Only four of the remaining eight corporations and five of the remaining eleven individuals have appealed from the grant of the preliminary injunction below. The application for a preliminary injunction was filed on June 19, 1974, by order to show cause supported by a number of affidavits and exhibits and assigned to Judge Judd. On July 5, 1974, after assorted motions on the part of both the CAB and the defendants, Judge Judd proceeded to hear the direct testimony of the first CAB witness, George S. Minichiello, a special agent in the Bureau of Enforcement, and the start of his cross-examination. At the close of the hearing on that day, at the defendants' request, the case was adjourned until July 19, 1974, and the defendants were directed to submit affidavits by July 16. On July 11, 1974, the court granted the CAB's request to take depositions and extended the defendants' time to file affidavits until July 19. On July 18 immunity was granted to two witnesses who were being deposed by the CAB. On July 19 consent orders against certain defendants were submitted and signed, motions of remaining defendants for partial summary judgment on Count Two of the complaint were argued and denied, and further cross-examination of Minichiello was had.

At the conclusion of the hearing on July 19, the issues were referred by Judge Judd to United States Magistrate Vincent A. Catoggio (who had been present during the hearing to obtain "background" on the case) to hear and report. The order of reference was signed on July 22, 1974, and a report was requested by July 29, with the hearing on its confirmation set for July 30. The order of reference specified as grounds the need for taking considerable testimony and the imminency of criminal trials of persons in custody.[1] In the subse-

---

1. The order of reference read as follows:

     The court having commenced hearing testimony on plaintiff's motion for a preliminary injunction, and it appearing that even the testimony appropriate on such a motion cannot be heard during the intervals of criminal trials of defendants in custody, and the court finding that exceptional circumstances exist which require a reference to a Master, it is

     Ordered that the issues arising on plaintiff's motion for a preliminary injunction are referred to Hon. Vincent A. Catoggio, United States Magistrate, pursuant to F.R.Civ.P. 53(b) and 28 U.S.C. § 636(b)(1); and it is further

     Ordered that the Magistrate shall file a report relating to as many defendants as possible on July 29, 1974; and it is further

     Ordered that argument on the confirmation of the report be heard before the court on July 30, 1974 at 3:30 p. m. in Courtroom 11; and it is further

     Ordered that the court may modify or supplement this Order of Reference as justice may require.

quent order granting the injunction the court elaborated that the reason for the reference had been that the judge would "be engaged in a criminal jury trial the following week."

The date on which the magistrate's report was requested was fixed to permit decision before departure of the court on vacation. During the week of July 22, further hearings were held by the magistrate. At the request of the defendants and over the objection of the CAB the times fixed in the order of reference were extended so as to give the magistrate further opportunity to study the cases. His report was ultimately filed on August 27, 1974. None of the defendants appealing here objected to the reference to the master at any time, although apparently some non-appealing codefendants did object. The CAB as a matter of Department of Justice policy also objected to the reference.

Reference here was made in accordance with the provisions of Fed.R.Civ.P. 53.[2]

Since service as a special master is one of the duties specifically authorized for United States magistrates under 28 U.S.C. § 636(b)(1),[3] it is necessary to consider both Fed.R.Civ.P. 53 and the Federal Magistrates Act of 1968, 28 U.S.C.

§ 631 et seq., and their history to determine whether the reference here was proper. *See* Comment, An Adjudicative Role for Federal Magistrates in Civil Cases, 40 U.Chi.L.Rev. 584 (1973).

The matter of reference to special masters while grounded in and taken over from English chancery practice has had a long and sometimes stormy history in the United States. The practice is an ancient one the history of which has been better related elsewhere. *See, e. g.,* Eastern Bridge & Structural Co. v. Worcester Auditorium Co., 216 Mass. 426, 103 N.E. 913, 915 (1914). The practice of reference to a master was long recognized in the federal courts. *See* Kimberly v. Arms, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764 (1889).[4] The power was said to be "inherent" within the courts "to provide themselves with appropriate instruments required for the performance of their duties" and was said to have been exercised "[f]rom the commencement of our government . . when sitting in equity" and to include the power "[t]o take and report testimony . . . ." Ex parte Peterson, 253 U.S. 300, 312–13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920).

The exercise of the power of reference, at least in the days before full-time

---

**2.** Rule 53(b) provides as follows:

A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

**3.** 28 U.S.C. § 636(b)(1):

Any district court of the United States . . . may establish rules pursuant to which any . . . magistrate . . . may be assigned within the territorial jurisdiction of such court such additional duties as are not inconsistent with the Constitution and laws of the United States. The additional duties authorized by rule may include, but are not restricted to—(1) service as a special master in an appropriate civil action, pursuant to the applicable provisions of this title and the Federal Rules of Civil Procedure for the United States district courts . . .

By order dated April 20, 1971, the United States District Court for the Eastern District of New York authorized magistrates to perform all additional duties permitted by statute. General Rule 25.1.

**4.** The reference of a whole case to a master, as here, has become in late years a matter of more common occurrence than formerly, though it has always been within the power of a court of chancery, with the consent of the parties, to order such a reference . . . . . The power is incident to all courts of superior jurisdiction . . . . . By statute in nearly every state, provision has been made for such references of controversies at law. And there is nothing in the nature of the proceeding, or in the organization of a court of equity, which should preclude a resort to it in controversies involving equitable considerations.

129 U.S. at 524–25, 9 S.Ct. at 359 (citations omitted).

paid federal magistrates, resulted in a number of difficulties. Foremost, perhaps, was expense, stemming from the fact that generally the masters charged fees and were in effect paid by the piece. *See* Chief Judge Kaufman's Masters in the Federal Courts: Rule 53, 58 Colum.L.Rev. 452 n. 4 (1958). References, moreover, often entailed considerable delay since many of the special masters were attorneys who gave their private practice precedence. *See* A. Vanderbilt, Cases and Other Materials on Modern Procedure and Judicial Administration, 1240–41 (1952). Beyond this, the appointment of masters who were practicing members of the bar raised serious problems of conflict of interest. *Cf.* United States v. O'Connor, 291 F.2d 520, 526 (2d Cir. 1961). In any event, for these reasons and perhaps others that were not particularly articulated, Rule 59 of the Equity Rules of 1912, 226 U.S. 666, for the first time used the language "[s]ave in matters of account, a reference to a master shall be the exception, not the rule, and shall be made only upon a showing that some exceptional condition requires it." That sentence, which in substance was carried over to present Fed.R.Civ.P. 53, was entirely new in the 1912 Equity Rules. *See* J. Hopkins, New Federal Equity Rules Annotated (6th ed. 1929), at 272–73. The 1912 rules were construed not to work any change in the powers of the court except to depart from the old method of referring *all* cases; reference was still considered "left to the discretionary

power of the court to say what character of case shall be deemed exceptional . . . ." Holt Manufacturing Co. v. C. L. Best Gas Traction Co., 245 F. 354, 357 (N.D.Cal.1917). Equity Rule 68,[5] 226 U.S. 669 (1912), did not change the substance of the rule, and it was held in Ex parte Peterson, *supra,* that the Seventh Amendment did not prevent the appointment of an auditor and the conduct of a preliminary hearing intended to define and simplify the issues or affect the master's power "to make tentative findings." 253 U.S. at 310, 314, 40 S.Ct. 543.

Nevertheless, the Supreme Court quite readily construed the "exception, not the rule" language of the Equity Rules as forbidding *blanket* referrals of, e. g., all patent cases, Los Angeles Brush Manufacturing Corp. v. James, 272 U.S. 701, 47 S.Ct. 286, 71 L.Ed. 481 (1927), even while the particular reference in that case was held not to be an abuse of the district court's discretion because calendar congestion and the priority given to criminal cases were preventing consideration of other civil cases by the trial courts.[6]

But for reasons stated, reference to masters has not always had either clear or happy sailing in the courts. *See* Kaufman, *supra.* Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 131 F.2d 809, 815 (7th Cir. 1942), sets forth the reasons of delay, expense, entitlement to the decision of a judge and confidence in the outcome of the contest as going against the use of masters

---

5. Appointment and Compensation of Masters.

The District Courts may appoint standing masters in chancery in their respective districts (a majority of all the judges thereof concurring in the appointment), and they may also appoint a master *pro hac vice* in any particular case. The compensation to be allowed to every master shall be fixed by the District Court, in its discretion, having regard to all the circumstances thereof, and the compensation shall be charged upon and borne by such of the parties in the cause as the court shall direct. The master shall not retain his report as security for his compensation; but when the compensation is allowed by the court, he shall be entitled to an attachment for the amount against the party

who is ordered to pay the same, if, upon notice thereof, he does not pay it within the time prescribed by the court.

6. . . . we are not inclined to infer that there has been any deliberate abuse of discretion in this matter or to hold that there may not sometimes be such congestion in the docket as to criminal cases as would justify a District Judge in not literally complying with the requirements of the two rules [Rules 46 and 59] in question. There has been an emergency, due to a lack of judges in some districts, which we cannot ignore.

272 U.S. at 708, 47 S.Ct. at 289.

"save where exceptional circumstances are shown." Finding reference improper in that case, the court ordered its costs assessed to the plaintiff who had requested the reference. The court did not remand for a trial, however.

*Adventures in Good Eating,* along with a few other cases from the Seventh Circuit, was particularly relied upon by the Supreme Court in LaBuy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), where the Court dealt the practice of reference to special masters a substantial, if not a fatal blow. There the Court held in an antitrust case that the presence of unusually complex issues of fact and law is not justification for reference to a master but rather an impelling reason for trial before a regular, experienced judge who was familiar with that case already involving numerous pretrial findings and orders. 352 U.S. at 255–56, 259, 77 S.Ct. 309. The Court, moreover, to a considerable extent backtracked on its specific holding in the *Los Angeles Brush* case (without citing it in this connection, we may say) when it said that: "But, be that as it may, congestion in itself is not such an exceptional circumstance as to warrant a reference to a master. If such were the test, present congestion would make references the rule rather than the exception." 352 U.S. at 259, 77 S.Ct. at 315.[7] Were we to read *LaBuy's* broad language literally and without reference to the prior history briefly alluded to above, we would be required to rule that the reference had been improper.[8] But Rule 53 does not mandate no reference in any situation whatsoever. A degree of discretion is exercisable un-

der it and whether or not there was a proper exercise in this case is dependent not only on the facts but also on the change of circumstances that has been wrought by the passage of the 1968 Federal Magistrates Act, 28 U.S.C. §§ 631–639.

In the 1968 Act, Congress gave magistrates jurisdiction over certain petty criminal offenses, 28 U.S.C. § 636(a). This was the most controversial grant of power. The Act also had the purpose of enabling magistrates to relieve district courts of some part of their civil workload. 28 U.S.C. § 636(b). *See* Hearings on S. 3475 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., at 11 n. 3 (1967). Even prior to the Act control of discovery and conduct of pretrial hearings were functions which it was considered the use of the federal magistrate in civil hearings could promote. *See* Kaufman, *supra* at 463.

Questions have been raised, to be sure, about the use of magistrates in ultimate decision making such as ruling on a motion to dismiss or a motion for summary judgment. The Seventh Circuit, for example, has held that district courts have no power to delegate such duties to magistrates. TPO, Inc. v. McMillen, 460 F.2d 348 (1972).[9] In addition, with specific reference to the provision of § 636(b) permitting a magistrate to be assigned to serve as a special master in an appropriate civil action under the Federal Rules of Civil Procedure, the Report of the Senate Committee on the Judiciary on S. 945, S.Rep.No.371, 25–27 (June 28,

---

7. In so holding the Court upheld the Seventh Circuit Court of Appeals' discretion in vacating the district judge's order of reference, which had yet to be carried out. The Court did not reach the issue whether improper reference would warrant a remand.

8. Our disposition of this issue makes it unnecessary for us to reach the question of the effect of an improper reference. In Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 131 F.2d 809 (7th Cir. 1942), improper reference warranted only assessment of costs to the party so moving. Here neither party

moved for reference to a master and the salaries of masters are no longer paid by the parties. *See* 28 U.S.C. § 634. Assessment of costs, therefore, would not be a remedy for an improper reference in this case, if it would in any.

9. Whether or not we agree with the particular decision, the examination of the legislative history and constitutional concerns over the matter of magistrates' status and jurisdiction there set forth is most helpful.

1967), U.S.Code Cong. & Admin.News, p. 4252 points out that the "exception and not the rule" and the "exceptional circumstances" language of Rule 53(b) was very carefully incorporated by reference into the Federal Magistrates Act. The Senate Committee said that "These conditions which in essence reflect the rule laid down by the Supreme Court in LaBuy v. Howes Leather Company . . protect against any abdication of the decisionmaking responsibility that is properly that of the district courts." Finally, we recently have had the guidance of Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), where the Court, incorporating the holding in Holiday v. Johnston, 313 U.S. 342, 352–54, 61 S.Ct. 1015, 85 L.Ed. 1392 (1941),[10] held that the Act did not change the requirements of 28 U.S.C. § 2243 that federal judges personally conduct habeas corpus evidentiary hearings. The Court there once again emphasized that in the Federal Magistrates Act "Congress carefully circumscribed the permissible scope of assignment to only 'such additional duties *as are not inconsistent with the Constitution and laws of the United States.*' 28 U.S.C. § 636(b) (emphasis added)." 418 U.S. at 470, 94 S.Ct. at 2848.

■ We are left, then, with the question whether the circumstances here were sufficient to justify Judge Judd's exercise of discretion. In this connection it must be remembered that he was not delegating the judicial decision making function as to the entire case, but only was delegating the power to make initial findings in connection with the prelimi-

nary injunction. Thus the broad language of *LaBuy, supra,* and the contradictory language relative to congestion of *Los Angeles Brush, supra,* are not wholly applicable to the case at hand.[11] So, too, the summary decision in McCullough v. Cosgrave, 309 U.S. 634, 60 S.Ct. 703, 84 L.Ed. 992 (1940), the background circumstances of which are set forth in 5A J. Moore, Federal Practice § 53.05[1] at 2942, is not controlling, since it involved reference to a master for trial.

Here the use of a master was "to aid [the] judge in the performance of specific judicial duties, as they may arise in the progress of a cause." Ex parte Peterson, 253 U.S. at 312, 40 S.Ct. at 547. *See* LaBuy v. Howes Leather Co., 352 U.S. at 256, 77 S.Ct. 309. Here the court not only did not refer the entire case to the magistrate, it took evidence from the parties itself on the motion for a preliminary injunction; the principal CAB witness was heard on two different days both on direct and cross-examination. The order of reference came only after proceedings had become sufficiently complicated [12] with a sufficient number of parties and different motions that it appeared as though it might have to be postponed so as not to interfere with the trial of a criminal matter where the defendant was in custody. Speedy disposition of criminal cases has greatly concerned our Judicial Council, see Second Circuit Rules Regarding Prompt Disposition of Criminal Cases promulgated January 5, 1971, as amended May 24, 1971, and specifically Rule 50(b) of the Federal Rules of Criminal Procedure requires preference be given to criminals in cus-

---

**10.** The Court in Holiday v. Johnston, 313 U.S. 342, 353, 61 S.Ct. 1015, 85 L.Ed. 1392 (1941), explicitly distinguished the practice of referring cases to masters in equity cases from the conduct of an evidentiary hearing in a habeas corpus case.

**11.** LaBuy v. Howes Leather Co., 352 U.S. 249, 256, 77 S.Ct. 309, 313 (1957), involved an attempted reference of an entire antitrust trial, all issues included, to a master. In that case, the Court also found that the district court judge attempted to make this reference despite the fact that due to his exclusive involvement

in the pretrial proceedings he could "dispose of the litigation with greater dispatch and less effort than anyone else." In Los Angeles Brush Corp. v. James, 272 U.S. 701, 47 S.Ct. 286 (1927), the Court denied leave to file a petition to show cause why a writ of mandamus should not issue against a district court judge to prevent reference of a complete patent trial to a master.

**12.** It is true that the magistrate was present at the trial from the beginning, indicating that Judge Judd suspected that a reference to a master would be necessary.

tody. *See also* Plan for Achieving Prompt Disposition of Criminal Cases effective April 1, 1973.[13]

District Judge Judd, moreover, neither abandoned to the magistrate his prerogatives nor acted simply·as a rubber stamp in respect to the magistrate's report. The court made an extensive examination of the evidence in its own right on the basis of depositions, affidavits and testimony that it heard, and while it confirmed all eight of the magistrate's findings of fact it made further findings on its own, incorporated in its opinion, and confirmed only three of the six conclusions arrived at by the magistrate. The result reached by the court was exactly the contrary of that recommended by the magistrate (in that the latter recommended denial of a preliminary injunction while the court below granted it).

Two other factors are worthy of mention. In the first place there is nothing to indicate that the Eastern District of New York or the judges thereof are attempting to evade or avoid their responsibilities by excessive references, as may have been the case prompting the broad language of the decision in *LaBuy, supra.* We believe these conscientious judges have complied not only with the letter but with the spirit of Rule 53(b) which carries over, as we have indicated, into the Federal Magistrates Act. They have made references "the exception and not the rule." The public interest, moreover, required a prompt determination of the question of a preliminary injunction here. As will be seen from the statement of facts below, millions of dollars, thousands of passengers and considerable importance to the airlines and the traveling public are involved in this litigation. It appeared that a speed-up of the determination on the preliminary injunction

would result and, judging from all the record before us, did result from the reference. Absent the reference, a criminal trial entitled to priority would have delayed matters. To be sure, there are other judges in the Eastern District to whom the case might have been referred. They, too, are busy judges, with the weighted filings in the court being 41st among the districts in the United States and the number of trials completed per judge 47th. *See* Management Statistics for United States Courts 1974 at 22. And they would·have had to recommence this case almost from the beginning.

We hold, then, that reference to the magistrate here was the exception and not the rule and was under "exceptional circumstances," making it proper within Federal Rule 53(b) as it has been incorporated in 28 U.S.C. § 636. We turn, then, to the other points raised on this appeal.

## II. OTHER PROCEDURAL POINTS.

Appellants claim that the CAB indulged in "judge-shopping" in violation of Local Rule 2 and that the defendants in the case were intentionally misjoined. We find these two claims unmeritorious.

■ Under Rule·2. of the Individual Assignment and Calendar Rules of the United States District Court for the Eastern District of New York, ordinarily the case would have been assigned at random to one of the judges. By virtue of Rule 3, since the "information sheet" accompanying the complaint denominated the case as "related" to CAB v. Aeromatic Travel Corp., 489 F.2d 251 (2d Cir. 1974), the case was assigned to Judge Judd to whom the *Aeromatic* case had been randomly assigned on remand. Appellants argue that their case is not re-

---

**13.** Section 1 of the Plan in effect in the Eastern District states

> Insofar as is practicable:
>
> (a) the trial of criminal cases shall be given preference over civil cases, as provided by Rule 50(a), Federal Rules of Criminal Procedure; and
>
> (b) the trial of defendants in custody and defendants whose pretrial liberty is reason-

ably believed to present unusual risks should be given preference over other criminal cases . . . .

We take judicial notice that the Eastern District of New York has one of the heavier criminal dockets in the country, particularly in view of the fact that it is one of the central places into which illegal narcotics, particularly heroin and cocaine, are imported.

lated to *Aeromatic* since the defendants are different and none of them acted in concert with the *Aeromatic* defendants. They contend that Local Rule 3, permitting assignment to a particular judge,[14] does not apply because the facts and legal issues are not the same. *Aeromatic* involved five travel agencies, their officers and employees arranging charter flights between the United States and Europe but selling tickets to members of the general public. There the Board claimed, as it does here, that those activities made the agencies indirect air carriers operating without certificates in violation of 49 U.S.C. § 1371(a) or indirect foreign air carriers operating without permits in violation of 49 U.S.C. § 1372(a) and in violation of the very regulations here challenged, 14 C.F.R. Parts 207, 208, 212 and 214. Our court reversed the district court's order which had stayed the proceedings under the doctrine of primary jurisdiction and ordered that the CAB could sue to enjoin the activities of the defendants in district court and remanded for consideration whether the activities violated the Act. The cases were substantially similar in terms of their issues since each allegedly involved unauthorized operations by indirect air carriers in the affinity charter market in violation of the Act and CAB regulations. It may be that the facts of *Aeromatic* and this case were not exactly the same, but at least according to the allegations of the complaint there was every reason to believe that the facts were similar and legal issues were substantially the same; that is all that is necessary under the local rule, which seems to us a wise one.[15]

■ With regard to the alleged misjoinder of parties, it may be noted concerning the appellants that Carefree Travel, Inc., and Vacation Ventures, Inc., are affiliated corporations owned by a common parent; appellant Doran Jacobs is a vice president of both corporations and a stockholder of the parent. Appellants Esther Zetlin and Jack Gorcey act on behalf of Surrey International Travel, Inc., and appellants Ernie Pike and Henry Zetlin act on behalf of Ernie Pike Associates, Ltd. Together they provide to retail travel agents affinity charters to Las Vegas and Hawaii, Surrey being a travel agent of record receiving a commission from the airline and offering committed space to Pike. All appellants are represented by the same counsel; all were engaging in the alleged "black market" operation of affinity charters. Overall we do not see any prejudice to the two groups, Carefree Travel and Vacation Ventures on the one hand or Surrey International and Ernie Pike Associates on the other, by virtue of their joinder in the same action. The operative facts are related even if the same transaction is not involved. Questions of law and fact common to all defendants do arise as evidenced by counsel's representation. In short, this is not a case like Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casualty Co., 497 F.2d 1151, 1154 (2d Cir.), cert. denied, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974), where the misjoinder rested on thousands of unrelated transactions and in which "[n]o connection at all between the practices engaged in by each of the 164 defendants ha[d] been alleged." [16]

---

14. . . . when because of similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of the time of the whole court is likely to result if the cases are assigned to the same judge.

15. The rule is written in the disjunctive; "aris[ing] from the same transaction" appears in only one clause. Appellants' arguments, therefore, that defendants in both cases must be the same or act in concert with each other read Rule 3 *too narrowly*.

16. Nor do we see prejudice in the original action which included *some defendants not appealing*. Judge Judd found that "development of the evidence has shown business relations among most of the defendants." In addition, his careful opinion described the applicable evidence for each of the defendants separately, and the injunction granted did not extend to all defendants.

## III. THE MERITS OF GRANTING THE PRELIMINARY INJUNCTION.

■ Since the Board's suit for injunctive relief is expressly authorized by statute, 49 U.S.C. § 1487, it is only additionally necessary for the Board to demonstrate a reasonable probability of success on the merits in order to make available the discretionary award of relief. *See* CAB v. Modern Air Transport, 81 F.Supp. 803, 806 (S.D.N.Y.1949), aff'd, 179 F.2d 622 (2d Cir. 1950). No substantial quarrel is had with the facts alleged in the complaint or as found below. The legal questions are, as we will show, sufficiently clear to warrant the lower court's conclusion that the appellee Board has a reasonable probability of success on the merits.

Appellants dispute the applicability of the CAB regulations in question to them both as a matter of fact and as a matter of law. They also dispute the validity of the regulations both under the Federal Aviation Act and more particularly the antidiscrimination provisions of § 404(b) of the Act, 49 U.S.C. § 1374(b),[17] and under the Fifth Amendment to the Constitution (insofar as it incorporates or implies the equal protection clause). The appellants further dispute the issuance of the preliminary injunction on the bases that the hardship to them outweighs any hardship to the plaintiff or the public, that the CAB does not have any great probability of success on the merits, and that the public interest lies in permitting affinity charters readily to be sold to the traveling public. Finally, appellants argue that the injunction as issued is overbroad and vague. We will take up each of these questions in turn after a brief further statement of the facts.

The case originates, as Judge Judd pointed out, from the effort of the CAB to maintain a dual price structure, that is, to permit the carriers to charge one price for tickets sold on regularly scheduled flights and a lower price for charter flights. To prevent abuse of charter flights and to protect the regular airline business, the CAB has promulgated extensive regulations applicable to different kinds of charter flights. This appeal involves "pro rata" charter flights, which are known in the travel business as "affinity" charters. In essence, an affinity charter involves a flight by members of an organization, club or other such group having some community of interest apart from a desire to participate in the charter, who engage an aircraft which will be paid for on a pro rata basis by the traveling members.[18]

The regulations, 14 C.F.R. Parts 207, 208, 212 and 214,[19] restrict affinity charter flights in various ways. Section 207.-4(a) requires, for example, that every agreement to perform a charter trip has to be in writing and signed by the authorized representative of the air carrier and the charterer.[20] The key regulations here involved include:

1. Section 207.11(b)(2), prohibiting engagement of an aircraft by a person whose business is formation of travel

---

**17.** No air carrier of foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person . . . or description of traffic in air transportation in any respect whatsoever or subject any particular person . . or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

**18.** 14 C.F.R. §§ 207.11(b)(2), 207.40(b), 207.41, 207.43.

**19.** Part 208 relates to supplemental air carriers, and Parts 211 and 212 to foreign air carriers. These Parts provide similar requirements to Part 207 in respect to affinity charters.

**20.** The carrier must hold a certificate of public convenience and necessity issued by the Board. *See* 14 C.F.R. § 207.2 and 14 C.F.R. §§ 207.21–207.26. *See also* 14 C.F.R. §§ 207.-40–207.47. The regulations contemplate that a third party, not a party to the charter contract, may help the contracting parties arrange the charter flight; the third party, the "travel agent," is defined as "any person engaged in the formation of groups for transportation or in the solicitation or sale of transportation services." 14 C.F.R. § 207.1. *See* 14 C.F.R. §§ 207.30–207.31.

groups or solicitation of transportation service;

2. Section 207.21, prohibiting first the solicitation of individuals as opposed to solicitation of an organization and, second, the employment of persons for the purpose of organizing and assembling members of any organization or club into a group until after the charter contract is formed;

3. Section 207.22(a), providing that the charter contract shall include a provision that the charterer shall only act consistently with the CAB regulations and shall furnish any necessary supporting information required thereby;

4. Section 207.23, prohibiting the carrier from paying its agent a commission directly or indirectly in excess of five per cent of the total charter price (or the regular charter commission, whichever is greater) and preventing the payment of any commission if the agent receives any commission from the charterer;

5. Section 207.25, requiring payment in advance of the charter flight;

6. Section 207.40(a), prohibiting solicitations by chartering organizations beyond "the bona fide members of an organization (and their immediate families)";

7. Section 207.40(b), defining bona fide members as those who have not joined the organization merely to participate in the charter as the result of solicitation of the general public and who are members for a minimum of six months prior to the starting flight date (with certain immaterial exceptions here);

8. Section 207.41, permitting only bona fide members of the charterer (and their families) to participate as passengers, requiring them to be members of the specific organization authorizing the charter and requiring the chartering organization to maintain a central membership list showing the date each person became a member; and

9. Section 207.43, requiring charter costs to be pro rated equally among all the passengers.

Judge Judd found numerous violations of the above cited regulations. Evidence showed that Carefree Travel and Vacation Ventures are used interchangeably in the affinity charter business by appellant Jacobs, who is a vice president of both and a stockholder in their parent, Imperial Worldwide Group Tours, Inc. Vacation Ventures in May, 1974, reserved aircraft capacity on Overseas National Airways between New York and Las Vegas for two flights a week for a period of seven and one-half months. Carefree/Vacations subsequently prepared advertising flyers describing a program of round-trip flights from New York to Las Vegas combined with hotel, dining and entertainment arrangements and circulated them to a large number of travel agents. The anticipated airline revenue from these flights and other Carefree/Vacation charters was $7.3 million, and the anticipated hotel revenue $4.5 million. Liberty Travel Service, Inc., a large retail travel agency with 34 offices in the mid-Atlantic states, was one of the recipients of advertising materials from Carefree/Vacation; one of its branch managers testified that if a walk-in customer requested cheap air travel to one of the locations mentioned, his agency would reserve space for the customer on one of the charter packages, and there would be no requirement that the customer belong to any affinity group. Carefree/Vacation would then forward to Liberty Travel a packet of travel documents including a membership card in some organization for the customer and a boarding pass for the aircraft. The price for these charter flights was fixed by Carefree/Vacation and not based on a pro rata share of the charter cost. Thus the CAB alleged that Carefree/Vacation itself provides air transportation services to individual members of the general public on what purport to be affinity charter flights by direct sales from its offices, and that the customers need not be bona fide members of their flight's chartering organization, contrary to the CAB regulations. The CAB investigator, Mr. Minichiello, purchased a round-trip flight to Las Ve-

gas at a price in excess of the pro rata share of the total charter cost. He received in a Carefree envelope a tour membership card entitled "Swingin' Vegas" made out to his name, baggage tags and notification of the flight dates and times on Capital Airlines. He subsequently learned that the name of the supposed chartering organization for his flight was the Willowood Rifle and Pistol Club, and his name appeared on the passenger manifest.

Ernie Pike Associates (Pike), like Carefree/Vacation, coordinates affinity charter flights with hotel reservations, bus tours, sightseeing and other recreational activities. It was operating in the Las Vegas and Hawaii affinity charter markets, and apparently Surrey International Travel, Inc. (Surrey), which is an authorized travel agency, reserved the entire capacity of an aircraft in advance of the flight date and coordinated the flight with the necessary land arrangements. Pike secured the reserved space by paying the charter price of the aircraft to Surrey. Esther Zetlin, the wife of Henry Zetlin of Pike, is president of Surrey. Pike would send advertising flyers and other materials to retail travel agencies, describing its affinity charter packages, and when a travel agency called Pike to purchase one of the packages Pike would quote a price fixed for the package, which included the commission for the agency. Pike "presumes" that the customers of the individual travel agencies are members of bona fide chartering organizations. Surrey as travel agent of record for many of the charter packages put together by Pike frequently executed the required "Statement of Supporting Information" (SSI), see 14 C.F.R. § 207.60, and in response to Question 12 on the statement, which requires identification of "any intermediary involved in the charter," Surrey answered "None." For an affinity charter flight in early 1974 Pike and Surrey submitted to TransWorld Airlines, the carrier of record, a charter contract apparently signed by one "Jack Hausberg" on behalf of the "Knights of Pythias." Investigation revealed that the Knights of Pythias had nothing to do with this charter and did not have a member named "Jack Hausberg." Additionally, a Rita M. Collins, who was an employee of Pike, filed an affidavit that she executed charter documents and passenger manifests evidencing the membership of passengers on affinity charter packages put together by Pike in various bogus charter organizations.

Appellants claim that the regulations are not applicable to them since the regulations apply only to the air carriers, the chartering organizations and travel agents.[21]

Appellants argue that there is no allegation that they were acting in concert with air carriers. They have neatly sidestepped the argument of the CAB, however, that they are acting as indirect air carriers. *See* CAB v. Aeromatic Travel Corp., *supra.* Since the Act defines an air carrier as anyone "who undertakes, whether directly or indirectly or by a lease or any other arrangement to engage in air transportation . . . ," 49 U.S.C. § 1301(3), the CAB quite properly argues that by selling aircraft transportation to the general public other than as an authorized agent of a direct carrier and by consummating transportation arrangements, the appellant corporations have acted as indirect carriers. *See* Hacienda Hotels-Motels, Rooms and Flight Reservations, Inc., and U. S. Aircoach, Enforcement Proceeding, 26 CAB 372, 385 (1958), cited with approval in Aeromatic Travel Corp., *supra,* 489 F.2d at 254 n. 9; Monarch Travel Services, Inc. v. Associated Cultural Clubs, Inc., 466 F.2d 552, 554 (9th Cir.

**21.** The only rules expressly applicable to travel agents, such as Surrey, are Sections 207.30 and 207.31, the former prohibiting a travel agent from receiving a commission from both the air carrier and the charterer, and the latter requiring a travel agent to execute a part of the SSI to the effect that it has acted in a manner consistent with Part 207 of the Board's regulations. This alone, however, would appear to make Surrey in violation of the regulations and the regulations applicable to it.

1972), cert. denied, 410 U.S. 967, 93 S.Ct. 1444, 35 L.Ed.2d 701 (1973). Carefree/Vacation, through travel agents, sold transportation to individual members of the general public, to be sure with the help of bogus affinity group membership certificates, at a price fixed by Carefree/Vacation, and thus it was indirectly undertaking to engage in air transportation "by a lease or any other arrangement." It thus appears to be an unauthorized carrier under 49 U.S.C. § 1371(a), since it does not have the necessary certificate of public convenience and necessity, and it has violated its duty under 49 U.S.C. § 1485(e) to comply with the affinity charter regulations. So, too, with Pike and Surrey which reserved bulk air transportation and sold to affinity groups and individuals through retail travel agencies at a price fixed by Pike, again facilitating sales by the preparation of bogus affinity group membership certificates and signing charter contracts directly with carriers in the name of chartering groups without authorization. While Pike and Surrey are distinct corporate entities, their joint activities amount to unauthorized air transportation under, e. g., North American Airlines v. CAB, 100 U.S.App. D.C. 5, 240 F.2d 867 (1956), cert. denied, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957).

Appellants seek to sidestep the CAB contention, indeed they have gone so far as to file a motion to strike this portion of the CAB's brief, on the basis that the district court specifically held that they were not "indirect air carriers." They misread the district court decision, however, as we view it. What the court did say was that

> if a contract between an airline and a chartering organization is subject to specific regulations, a defendant who takes part in conduct which violates those regulations should not be permitted to claim immunity from injunctive relief just because he does not have a license as an air carrier.

The court went on to say that Count One of the complaint, alleging that none of the defendants had a certificate of public convenience or necessity, did charge that the appellants were acting as indirect air carriers and pointed out that a justification for not dismissing Count Two is that it incorporates all of the allegations of Count One and adds specific acts in violation of the CAB regulations. It is true that Judge Judd did hold that a full hearing might reveal that not all wholesalers are necessarily in violation of the Act. He said,

> So long as the wholesaler is not a party to facilitating violation of the basic restrictions on affinity charter flights, or to offering such flights to the general public without regard to six months membership in chartering organizations or to membership in independent groups of 40, the court believes it is against the public interest to issue a *preliminary* injunction.

(Emphasis original.) However, the court said specifically that

> in the second category,[22] a person without a certificate who attempts to do something in connection with air transportation which a certificated air carrier would be expressly forbidden to do is an "indirect air carrier" in the sense that he is attempting to usurp some of the functions of an air carrier without the responsibilities of such a carrier.

(Footnote added.) The entire discussion of the "indirect carriage" point in the court's opinion indicates that it *was* holding that these people were indirect air carriers in the sense that they were "usurping" air carrier functions, and functions which were in violation of CAB regulations. Citing a number of cases, Judge Judd said that while these cases are "not identical with the present case . . . the variety of situations shows that there are no rigid requirements for being an indirect air carrier, as defendants assert." The fact that the

---

**22.** The first or more usual category would involve a person lacking the necessary certificate undertaking to do what a certificated carrier could properly do.

court subsequently said that "[a] general prohibition against acting as an indirect air carrier, as requested by C.A.B., is too vague for proper inclusion in a preliminary injunction" merely went to the matter of relief. It in no way affects the court's prior conclusion, which we sustain, for purposes of the preliminary injunction, that the regulations are applicable to the appellants.

The appellants' principal argument, based upon the anti-discrimination provisions of the Federal Aviation Act and asserted to have constitutional dimensions, is that the criteria for charter worthiness are insufficiently "transportation-related." Therefore rate preferences accorded the charter classifications "must be deemed unjustly discriminatory." Appellants argue also that the limitation or arbitrary minimum of 40 participants per charter operates to prefer large organizations such as General Motors over small ones such as a bowling league.

The Board has been concerned that their existing rules, limiting charter travel to groups having "prior affinity," tended to discriminate against members of the public who did not belong to qualified organizations with a membership large enough to create a charter program and that their existing rules were difficult to enforce. The Board has also apparently recognized that the operators of illegal charters have been satisfying an ever increasing public demand. We agree with appellants that there is something for saying that the individual passenger's affinity to some organization should be irrelevant to his right as a member of the public to have equal access to all modes of service offered by common carriers.

■ At the outset, there is a question of appellants' standing to assert these claims since they are not members of the traveling public. See O'Shea v. Littleton, 414 U.S. 488, 493–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 428–31 (1974). Appellants are facilitators of travel, however, and their economic existence is dependent upon the travels of others. As the court below found, affinity charter flights are big business for defendants; commitments run into millions of dollars. For that reason the court permitted more extensive proof than ordinarily would be appropriate in connection with a preliminary injunction. Allegedly discriminatory travel regulations thus create sufficient injury in fact for appellants to have standing. See generally Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ There is nothing in the statutes specifically affording to the Board the power to authorize regularly certificated carriers to engage in charter transportation, although the statutes quite plainly establish a category of supplemental air carriers which engage in only chartered trips. See 49 U.S.C. § 1301(33) and (34) and 49 U.S.C. § 1371(n). But the Board has been authorizing regular airlines to sell space for affinity charters at least since 1962 in order "to prevent the catastrophic degree of diversion from regular fares which would happen if low fare groups could be formed from the general public." See Agreement Adopted by the International Air Transport Association Relating to Group Fares, 36 CAB 33 (1962); National Air Carrier Association v. CAB, 143 U.S.App.D.C. 140, 442 F.2d 862, 873 (1971). As the District of Columbia court said, "There is absolutely no reason to think that Congress regards [the affinity principle] as beyond the scope of the Board's authority to approve." 442 F.2d at 874. Indeed this is practically conceded here when the appellants say (Brief p. 13), "To be sure, the Board is charged with the responsibility of distinguishing between individually ticketed service and chartered air transportation." [23] If the Board is authorized in the first instance to permit regular carriers to engage in charter traffic,

---

23. See also American Airlines, Inc. v. CAB, 121 U.S.App.D.C. 120, 348 F.2d 349 (1965).

the affinity requirement, even though it is quite imperfect, is not unreasonable. National Air Carrier Association v. CAB, *supra.* That the Board has adopted other regulations which make charter transportation available to all segments of the traveling public without regard to membership in affinity groups is evidence at most of the affinity charter imperfections, not their unconstitutionality. *See* 14 C.F.R. Part 372(a) (travel group charters) and Part 378 (inclusive tour charters). If a classification has some reasonable basis it is not unconstitutional. *See* Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). This is an economic classification which does not violate the equal protection clause. *See* Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

In terms of the statute itself, the Board's own interpretation of the provisions is entitled to some weight. *See* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). We have already held that the Board has the right to seek enforcement of the affinity regulations upon a proper showing. *See* CAB v. Aeromatic Travel Corp., *supra. See also* Trailways of New England, Inc. v. CAB, 412 F.2d 926 (1st Cir. 1969).

## IV. ISSUANCE OF INJUNCTION IN BREADTH.

Appellants argue that their hardships outweigh the public's. Despite the fact that they are shown to have arranged bogus groups, they urge that millions of dollars have been expended or committed in the making of reservations. If a preliminary injunction were to issue they would have to forfeit their large deposits and the traveling public would be unable to carry out its vacation plans "and would be, in effect, stranded." This argument falls on deaf ears in this court, since the appellants' hands are hardly clean. The existence of a large black market in air transportation is inconsistent with the promotion of adequate and efficient service at reasonable charges. 49 U.S.C. § 1302(c). "Individually ticketed, regularly scheduled service is the mainstay of an efficient air transportation system, and a critical necessity in any sophisticated economy." Saturn Airways, Inc. v. CAB, 157 U.S.App.D.C. 281, 483 F.2d 1284, 1287–88 (1973). Appellants' activities intrude on revenues of both the air carriers, some of whom are now in financially precarious situations, and on legitimate travel agents operating within the rules. We are firmly satisfied, as the district court was, that "the public interest factors . . . preponderate on the side of enforcing the law," at least for purposes of a preliminary injunction.

Appellants additionally complain that portions of the injunction are unduly burdensome and vague. We do not find them so; the district court's order seems to us quite properly to take the position that in arranging affinity charter flights appellants do know or should know all those involved and should insure that the chartering organization is bona fide and in compliance with the regulations, that only bona fide group members are ticketed, that the cost of the tickets has been pro rated and that all intermediaries involved have executed the necessary warranties.

Appellants assert that they have inaugurated corrective efforts to comply with the Act and the regulations so that they need not be enjoined, but we believe that the district court quite properly found that "there is still enough possibility of future violations to require court intervention." Therefore its issuance of injunctive relief was not an abuse of discretion.

Judgment affirmed; motion to strike portion of brief denied.